## WINDING UP OF THE LARGEST OF THE KU KLUX KLANS.

### Common Pleas Court of Summit County.

### A. O. HENRY ET AL V. FRANK COX ET AL.

### Decided January 3, 1927.

*Unsuccessful Effort to Disband a Ku Klux Klan—Division of the Property Halted—Findings and Order of the Court.*

Due largely to favoritism and autocratic action of the Realm and National officers of the Knights of the Ku Klux, the Summit County Klan, No. 27, the largest klan in the world, at a meeting attended by approximately 3,500 members, voted to surrender their charter and to place their property in the hands of a trustee to hold it for six months at which time disposition of it was to be made upon vote of forty per cent. of the members then in attendance. The vote was almost unanimous, but was taken under circumstances of great stress and excitement, with 800 members absent. The present suit, brought for the bzenefit of all members joining therein and seeking a decree confirming the action thus taken and to enjoin the officers of the Realm from interfering in any way with the property or its possession, has as defendants the non-assenting members who deny the legality of the action taken and are seeking a continuance of the klan and have elected officers and obtained a return of the charter. During the sixteen months preceding the trouble the Realm of Ohio received a total of $185,122.61, and expended only $2,894.36 for charitable purposes and welfare work, the balance going for salaries and operating expenses.

*Held:* That in the absence from the constitution and by-laws of the klan of any definite procedure for disbanding a local klan and disposing of its property, a majority vote of the membership could probably be made effective, but such action must be in keeping with and properly safeguard the fundamental purpose for which the property of the society was accumulated. But under the tense feeling and excitement of the occasion in question, on the vote of individuals who regard themselves as no longer members of the klan they were seeking to disband, a final disposition was made of the property without limitation, or restriction, or any regard for the purpose for which it was accumulated, or for the rights of those not participating.

The rules applying to churches and fraternal orders are not applicable to a society organized on the plan of the klan; and the court, seeing no possibility of effecting a reconciliation of the opposing factions, grants an order for a division of the property on the basis of two-thirds to the faction which sought to disband the klan and one-third to those who have opposed such action or have not participated therein.

*O. L. Dally* and *Commins, Brouse, Englebeck & Mc-Dowell,* for plaintiffs.

*Benner, Harter, Walker & Watters* and *John H. Connaughton,* for defendants.

WORLEY, J.

The issues in this case may be more readily understood by a brief recital of certain general facts relating to the order known as the Knights of the Ku Klux Klan, Incorporated, together with a statement of some of the provisions of its constitution.

In the constitution, after stating the name of the organization, it is referred to as "this Order," and, for the sake of brevity, I will adopt that designation when referring to the general or parent organization.

The order was incorporated in the state of Georgia, and it was designed to be world wide in its territorial domain, and as embracing the world it is called the Invisible Empire.

The territorial subdivisions are known as Realms, Provinces and Klantons. The Empire embraces the world. The Realm embraces a state. The Province embraces a part of a state, and the Klanton embraces a part of a province, and is the smallest subdivision territorially.

The organization known as a Klan occupies or has jurisdiction within a Klanton. Summit County Klan No. 27 has for its territory Summit county, Ohio, and this county constitutes a Klanton.

With respect to those who are familiar with the constitution of the Order, and with the by-laws of Summit County Klan No. 27, it seems wholly unnecessary to show how or why Summit County Klan No. 27 is a subordinate branch or society of the Order.

There are many provisions of both instruments which conclusively so show. And Summit County Klan No. 27 so regarded, when on September 18, 1926, at the regular meeting then being held, it voted to return the charter which it had received from the parent organization.

I state, then, without further discussion, that the said local Klan is a subordinate society of the Order, and as such is subject to the provisions of its constitution, and is unless it be that of voluntary quitting the order. It is true

entitled to the rights and privileges provided therein or necessarily implied by such provisions.

Both the constitution of the Order and the by-laws of the Klan have been introduced in evidence on the trial of the case, and I shall have occasion to refer to certain provisions of both. Summit County Klan organized and adopted by-laws in harmony with the constitution of the Order, and applied for and received a charter from the Imperial Wizard, the highest executive officer of the Order, and duly agreed to obey, abide by and be governed by all the provisions of the said constitution. The charter was granted on November 29, 1923, and the by-laws were adopted on May 9, 1925, and the Klan continued to manage and conduct its affairs up to September 18, 1926, at which time the action took place which was the immediate cause of this litigation.

At a regular meeting held on September 18, 1926, a resolution was passed to place all of the assets of the Klan in the possession of a trustee named therein to hold for six months, and with the further provision that at the end of such period further disposition of said assets should be made on the vote of forty per cent. of the members present at said meeting of September 18, 1926. Also a further provision of said motion was that the trustee should use the income from said assets for said period for charitable purposes.

A second resolution was passed to disband the Klan and return the charter to the Order. Both of these resolutions were supported almost unanimously by those present, according to the minutes, but not wholly so, according to the evidence, and the claim is made, and with some support by the evidence, that the action as to such motions was taken under excitement and stress of ill feeling, and was not well considered or deliberately taken.

At the time the membership of the Klan was slightly in excess of 4300, and those present at the meeting were estimated to number from 3000 to 3500. It was an unusually large meeting, probably about three times as many as usually attended a regular meeting.

For some considerable time prior to this meeting there had been jealousies, enmities and dissension in the Klan.

It was said to be the largest Klan in the world, and this no doubt had a tendency to promate rivalries among the members with respect to leaders, control and management. Under the provisions of the constitution, and of the by-laws, and by the activities of the Klan very large sums of money were collected, and this would and did have a tendency to promote friction.

The causes of dissension may be briefly summarized as follows: Questions of leaders, officials, suspension of certain members, alleged favoritism of Realm officials and National officials, division of the Klanton into new and additional Klans, usurpation of authority, dictation in political matters, failure to conserve interests of local Klan, the use of large funds for state and national organizations rather than for the local organization and community. Apparently the office of Exalted Cyclops was in controversy and the Klan had chosen Dr. W. K. Smith to act as business manager for the Klan. The national convention of the Order was in session at Washington city in the second week of September, 1926, and the Klan had sent a large delegation. At this meeting, for some reason not developed in the evidence, Dr. Smith was publicly banished in Washington, and his robe removed at the direction of the Imperial Wizard. This act seemed to be regarded as a culmination of all the grievances complained of and was indignantly resented by the delegation of the local Klan at Washington. At the same time, on the same day, the Grand Dragon of Ohio, C. Gilbert Taylor, sent a commission to Mr. Frank M. Cox, then at Akron, authorizing him to take charge of and manage the affairs of the Summit County Klan No. 27 until he should be superseded by other appointment. Mr. Cox was not acceptable to the local leaders and this appointment of Mr. Cox to take the place of Dr. Smith accentuated the feeling of hostility of the members of the local Klan.

All these things, and more, are disclosed by the evidence, and more detail was offered than was admitted, but sufficient was admitted to give the court an understanding of the situation. The court now regards the admission of this evidence as proper in the light of the nature of the controversy, and because of the nature of

the relief sought by both contending parties.   The pro-
ceeding is one in equity, and on an examination of the
constitution of the order, and of the by-laws of the Klan,
an especially because of their failure to contain provisions
to specifically cover the situation which developed, these
general facts may aid in reaching a solution of the con-
troversy.

The banishment of Dr. Smith had occurred on Septem-
ber 13, 1926, and information was at once sent to Akron,
and both the field operative force and the military force at
once became active to give out the word that a large at-
tendance was desired at the Saturday evening meeting. No
mention however was made of any special business being
in contemplation, if there was any such.   The meeting
was largely attended as already stated, with the result
stated.

Mr. Frank Cox, the special representative of Mr. Taylor,
the Grand Dragon, did not attend. Evidently it was appar-
ent that there was a general expectancy that something
out of the ordinary was likely to occur.

The group led by Rev. Henry, Mr. Clark and Mr. George
P. Jenks had charge of the meeting, which was held on
Saturday, September 18, 1926, and on Monday, September
20, this suit was commenced asking the court to enjoin
the officers of the realm and of the Order from in any
manner interfering with the property or the possession
thereof, and in effect to confirm what had been done,
and decree such action to be legal and within the authority
of the Klan.   The suit is brought by the plaintiffs for the
benefit of those members joining in such action.

The defendants, acting as representatives and officers
of the realm, and claiming to be acting for members of
Summit County Klan, not assenting to the action at the
meeting of September 18, 1926, controvert the legality of
such action, and seek to recover said property for the use
of the Klan as composed of members on September 18,
1926, who did not participate in said meeting and did
not assent to such action.   It is difficult to ascertain the
number of such for the reason there is no certain knowl-
edge of the number at the meeting.   If the number was
3000, then the number not present would be at least 1300.

If the number present was 3500, the number not present would be at least 800.

At any rate, a very considerable number, subsequent to the date of the meeting, were gathered together to take measures to continue the existence of the Summit County Klan, and they held meetings and elected officers, and the charter was returned, and accepted and adhered to, and this body at once claimed and still claim to be Summit County Klan No. 27, and as such claim the ownership of all said property, and seek to recover possession thereof. They also claim that those voting for the two resolutions heretofore stated by so doing voluntarily quit their membership, and are not entitled to any interest in said property or control over it.

This states the controversy, what it is and how it has arisen, and I will now state my conclusions with respect thereto, and briefly give my reasons therefor.

It is agreed that the property in question, on September 18, 1926, belonged to Summit County Klan No. 27. All dues to the state and national organizations had been paid in full.

I will say further, that while not formerly assented to by the parties, yet apparently it is conceded that the Klan could manage, use and dispose of this property as it might see fit so long as this should be done in harmony with the by-laws of the Klan and the general purpose of its collection as made manifest in said by-laws and the constitution of the Order.

An examination of the by-laws discloses that they contain no provision on the subject, unless it be Article 7, Section 7, thereof. This is as follows:

"All motions for the expenditures of money for any purpose other than expenditures for ordinary Klan operation must be made as follows: "Your Excellency, I move that the Klokann pass upon the expenditure of $———, for ————, and that, if in the opinion of such Klokann such expenditure be wise, that they order such expenditure.' In no event shall expenditures for charitable purposes be made from dues, klectokens, robes, etc., in amount exceeding 10 per cent of the amount thereof belonging to such Klan."

In my opinion this is not intended to provide for a plan of investing extensive accumulations of property such as is the amount in question, nor for the disposition thereof on an extensive scale.  Suppose the Klan was acting in harmony, and had an accumulation of $50,000.00 which it wished to use in humanitarian purposes of any kind, or for the purchase of fixed and permanent property for its use as a Klan, how would it proceed?  If the provision I have cited applies, then the action taken, even for the temporary possession of the property in question is not in conformity thereto, and would not be valid.

But if it does not apply, then how should the Klan proceed? For such case there is no provision in the by-laws, nor in the constitution.  In such case it is my opinion that action by a majority would be legal and effective.  But to be so, it must not controvert the general purpose for which the property was accumulated, and it must be such as to safeguard and reasonably secure the accomplishment of such purpose, so far as it may be ascertained, if at all.

In the absence of express provision for the method of control and use, I would not say that the Klan, by a majority vote, could not place the property in the hands of a trustee to hold temporarily.  But in this case much more than that was attempted.  The action was to place the property in the hands of a trustee for six months, to make final disposition thereof, and that, too, without limitation, or restriction, or direction and, not as Klan members, but as individuals, for at the same time, and in conjunction therewith, the majoriy undertook to disband the Klan, so that thereafter and from that very day there would be no Klan to act in the premises.

The attempted action, in effect, was to place the property absolutely and forever beyond the reach of the Klan, and beyond its control, and beyond its power to have any possible say as to its future use, control and disposition.

Could the majority do this?  Certainly it could not do this even if it had power to disband the Klan by a majority vote, for even in such event, it must still have some regard for the purposes for which the money was collected,

and for the rights of all concerned, so far as ascertainable. But in the attempted disposition absolutely no means were provided whereby there could be any assurance as to what use might be made of this property, or as to how the interest of all should be safeguarded.

The rule seems to be well settled that in making use and disposition of property accumulated under circumstances such as in this case, regard must be hald to the general purpose of accumulation, and to the rights of all concerned, so far as possible. And I state this rule without citing authorities in support thereof.

It is urged that final disposition of the property has not been made, but if the action be legal as to the direction provided for by said forty per cent of members in making final disposition, to whom are they accountable? Who can exercise control over them? And if I understand the proposition, that would be placing final disposition, not in the power of a majority of the whole body, but in a minority of a part of the body, assuming that such forty per cent. could still be considered as of the Klan.

However, as I understand it, at this time, it is not seriously contended that the part of the resolution which provides for final disposition by forty per cent. is effective.

But it is contended that the action taken was effective to disband the Klan, and effective to preserve the property intact and prevent its forfeiture to the Order, the parent body, and that the court has power to decree a disposition of the property in a manner to conserve the purpose for which it was collected and in such manner as to be fair and just to the contributors. And this leads me to consider the question of how a Klan may cease to exist. The by-laws of the Klan contain no provision in regard thereto. The Constitution of the Order containes no express provision with respect thereto, but does, by implication, state that it may cease to exist because of a revocation or concellation of the charter, or by a voluntary disbandment. But it does not provide any procedure for any of these methods. I refer to Article 18, Section 23, and found on page 76 of the constitution introduced as an exhibit in this case. The charter has not been revoked nor cancelled. Was the vote of the majority effective to disband it?

No procedure having been provided in the constitution of the Order, or in the by-laws of the Klan, the question must be determined by a consideration of the nature of the organization and the application thereto of general principles.

The constitution provides for a charter, the form thereof, that it must be issued by the Imperial Wizard, the chief executive officer, and must be accepted by the Klan and the acceptance recorded in the minutes. I call attention to the provision of the constitution as to the acceptance of the charter. It is Section 9 of Article 18 and is found on page 68 of the copy introduced in evidence.

In my judgment such acceptance means that all members give their assent thereto, and that the action must be by unanimous assent.

Membershap in the Order must be obtained by application, and each application is acted on individually. Without reading therefrom I refer to Article 4 of the constitution.

From a study of the provisions of the constitution of the order, binding on all members of all Klans, I conclude that all members become such voluntarily on compliance with the rules of entrance and possessing the essential qualifications and come is an individuals, and when once a member, each may voluntarily withdraw; and that as long as members of a Klan remain and adhere and act as a Klan, however small the number, such Klan still exists.

There may be provisional Klans. A Klan without a charter is a provisional Klan. In their inception, all were provisional. On application a charter · may be granted and when granted the Klan becomes a chartered Klan. I have been unable to find any provision of the constitution, setting forth the requisite number to make application for a charter.

However, from the evidence I find there was on September 18, 1926, about 4300 members of Summit County Klan, and that assuming there were at the meeting 3500 who assented to the action taken, there still remained about 800 members not participating or giving their assent.

Now considering the nature of the organization, being composed of a voluntary membership accepted as individuals, and with the right to remain or withdraw as individuals, and having individually assented to the provisions of the charter and so accepted same, can a majority disband the organization, leaving a remaining membership of about 800, not actually assenting, without standing as members, and without an organization? I do not think so. No such conditions attach to the granting of the charter as to empower a majority to cancel it, or surrender it. The charter itself contains no such condition or authority. No doubt in many matters, the majority may control the action of the Klan. But the majority may not say to the minority, "you can not longer be klansmen under the existing charter, and if you wish to continue to be klansmen, you must apply for and obtain a new charter and form a new society or oganization." Clearly such is in contravention of the scheme and plan on which the Order is based and conducted. It is contrary in principle and practice to the method of existence and operation of all similar bodies or societies. It is my judgment that the action of September 18, 1926, did not effect a disbandment of the Klan.

But if the charter has not been revoked, nor cancelled, and the Klan is not disbanded, what, then, is the effect of the action on those who took it? To my mind this question presents more difficulty than either of the other two.

I have concluded the action as to the disposition of the property was without authority, and not effective to make final disposition of the property, and that the action to surrender the charter and disband was without authority. But the attempt was made by members then in good standing, and in good faith and with the belief that the action taken was within their power and authority. How did this affect their standing as members from that date? The claim of the defendants is that such action in and of itself automatically worked a forfeiture of all rights as klansmen and of all interest in the said property, and that the title to this property remained in the klan as constituted by the members not joining in the said action of September 18, 1926.

The claim of the plaintiff is, that should it be held the said action is without effect to fully accomplish what was then attempted, then those joining in the action are still members of the Klan and that all their rights as such are preserved to them; that because of all the dissentions and causes thereof, the differences are so pronounced and irreconciliable, that in equity, and in the exercise of its extraordinary powers to do justice in all cases according to the facts peculiar to each case, the court should decree an equitable division of the assets between the contending groups.

What is the status of the members voting to disband and surrender the charter? How may members of a Klan cease to be such?

I have made some study of the constitution of the order with respect to this question, and I find no provision that fits the facts of this case.

Section 18 of Article 18 provides that a failure to pay dues automatically works a suspension. Also that payment of dues automatically re-instates such suspended member.

Section 19, Article 18, recognizes the fact that one may voluntarily quit the Order and surrender his robe.

Section 23, Article 18, page 76 of constitution in evidence contemplates that a charter may be revoked or cancelled, and a Klan disbanded, and in such event provides that all monies shall automatically become the monies of the imperial treasury.

It is a fair inference that any one of these things automatically terminates membership. The foregoing provisions are all I am able to find. Membership may cease as follows:

For failure to pay dues for three months.

By voluntarily quitting the order.

By revocation of the klan charter.

By cancellation of the klan charter.

By disbandment of a klan.

It is clear none of the members joining in the action of September 18, 1926, fall within any of these provisions, unless it be that of voluntarily quitting the order. It is true

they attempted to disband and surrender the charter. But they failed in their purpose. If they did not disband and did not surrended the charter, and having failed in what they intended to do in that respect, why should they be held to have lost their membership? It must be assumed their intention was to disband, to surrender the charter, and to cease to be members by reason thereof and not otherwise.

Why should it be held that they failed in two particulars and succeeded in a third? The three particulars were bound up and comprehended in one and the same act, taken in conjunction. It is a fair and reasonable inference that they had then known they could not disband and could not surrender the charter, they would not have voluntarily quit the Order. Is it not fair to assume their action as taken must be effective as intended or not effective at all? Can it be effective in part and not effective in part? Must it not all stand or all fall?

Any other construction seems unfair and unreasonable and in the nature of a penalty for misconceiving their power, authority and right. A quitting under such condition would not be a voluntary quitting. They might be amenable to charges, trial, and suspension, but no such thing has taken place.

It is my opinion that the members intended to quit the Order only on the condition that their action was effective to disband the Klan, and not otherwise.

It may be true, and probably is true, that a small number had an understanding as to what action was to be taken, or attempted. The minutes of the meeting would indicate as much. But it is highly probably that most of the members did not have any such understanding.

It is also true, as I conclude from the evidence and circumstances, that the members generally did not have opportunity to consider and act advisedly, but did act on impulse and without reflection, and that whether intentionally or not, they were stampeded by the force of circumstances.

Because of these considerations, it is my opinion that the action, alone, of the members on September 18, 1926,

is not enough to warrant the finding that they voluntarily quit the order, and that they have lost or forfeited all their rights, privileges and obligations as members of the Klan and of the Order.

I am not unmindful of the holding of courts to the contrary in certain cases. But the facts are different. Each case has its own peculiar facts, and each should be determined with reference to its own peculiar facts, and justice and equity done accordingly. I have examined the cases cited by counsel on both sides, and I find none with facts identical with the facts in this case.

Church cases ordinarily do not have a set of facts similar to those in this case. Generally in church cases the property in dispute is real estate, with houses of worship, or for school purposes, or parsonages, all fixed and definite in their use and purpose, and without which the society can not reasonable carry on its object. Not so in this case.

Or, the title to church property is not in the local organization, but is held by the local organization in trust for the whole denomination or body. Not so in this case. The title is absolute in the local Klan, and is much more like the case of Congregational churches, without any superior and controlling body. No where in the constitution of the Klan Order is it provided specifically how the klan may use its accumulated funds and property.

And the situation is different from that of Orders such as the Masons, Odd Fellows, Knights of Pythias, and all such like societies. In such cases the property consists of fixed and definite real estate or lodge buildings for constant occupancy for the convenience of members, and to promote the moral and social purposes of the order; or for purposes of investment to support the charitable purposes of the Order and these purposes are definitely defined and set forth in the constitution, rules and regulations. Or for insurance or sick and death benefits. But with the Klan all such things are almost wholly wanting, so far as constitutions and by-laws are concerned, and in actual practice, so far as the evidence in this case is concerned.

Article 2 of the constitution sets forth at length the purposes of the Order and as there set forth they are worthy, expressed in the most general terms, without a word of detail and containing no hint even as to how such purposes are to be accomplished, and not even a suggestion of property questions. And nowhere, so far as I can find, is there a single explicit provision whereby any Klan or member can assert a claim or demand for any specific use of any property of any kind except that of minor importance in observance of rituals, personal conduct, regalia, and such like things. I hav not been able to find where any klan or any member can assert any right to have accumulated funds such as that in controversy in this case used for any fixed and definite purpose.

In the by-laws of the Summit County Klan, in Section 5 of Article 1, it is provided that the objects and purposes of this Klan shall be the same as the objects and purposes named in Article 2 of the constitution and there it stops.

These things very radically distinguish this order from all church societies and all other fraternal orders so far as questions of use and control of property are concerned. And when we come to consider actual practice so far as the evidence is concerned, the situation is even more bewildering. It appeared that for a period of sixteen months the realm of Ohio received the sum of $185,122.61, and by the showing of the treasurer, expended only $2,894.36 for charitable purposes and welfare work, the balance being expended in salaries and operating expenses.

The grand dragon, Mr. Taylor, was inquired of as to what the realm had done in welfare work, and he mentioned the building of a church at Lima, Ohio, but it developed that while the church was promoted by Klan influence, the cost was contributed directly by members of the church and others—and that Klan money, collected as such, was not used. Of course, the matter of general benevolent work was not gone into extensively by either side, but enough was shown to indicate that so far, at least, no systematic and well defined work of this nature is provided for or carried on.

Nothwithstanding these marked distinguishing facts and

differences, I am asked to apply the prevailing rule as applied to church societies and fraternal orders. In my opinion such rule, in fairness and justice, should not be applied in this case. Should all the money and property be decreed to the defendants as the existing Summit County Klan No. 27, no one would be able to tell what would ultimately be done with it, for the reason that no by-laws or constitutional provision is sufficient to control and give direction to the use thereof. If it should be decreed to the other group, the same situation would obtain.

Apparently there is as much room to believe that it will be judiciously used and expended by one group as the other, and in this particular, I am not able to make any distinction.

I am of the opinion the groups can not be reconciled, and that to undertake to do so would be futile and serve no good purpose. It is difficult to determine with accuracy just the source of this property, and no showing was made as to the period of time covered in its accumulation.

Generally speaking, it came into existence by reason of Klan organization and Klan activities, and through the membership of this Klan.

I deem it unfortunate that the Order, and the Klan, when providing the rules and the stimulation for the accumulation of such large sums of money, did not also explicitly provide safeguards and directions for its judicious handling. I believe neither has done so, and therefore, all should be held to be equally responsible for this unhappy and unfortunate situation.

In my judgment this case is distinguishable from church cases and fraternal order cases and I have given my reasons for so believing. And I am disposed to determine the controversy on my view of the case as indicated in this opinion.

It is difficult to accurately determine the relative numbers of the contending groups, and just how accurately they represent the membership from whence the funds arose. Doubtless a considerable number of contributors do not now adhere to either group, but have fallen out from time to time, and it may be, without regret.

Having regard to this lack of complete information, and having regard to the apparent comparative numbers assenting to what was done on September 18, 1926, and those participating, and the probable changes since that time, I am of the opinion that a division of this property on the basis of one third to the non- assenting group and two-thirds to the assenting group will be as nearly fair and equitable as the division can be made.

It seems to me, on my theory, the non-assenting group can not complain of this, if they are not to get it all; and the assenting group are not in a position to complain, since it was by their hasty and precipitate action the situation arose.

In my judgment this will be fair and equitable, and will afford some prospect, at least, of this money being used in the community from which it was accumulated, and for general welfare purposes.

I am not disposed to disturb the payments made for current expenses prior to September 18, 1926.

As to the leasehold in controversy, if it has any cash value, that may be taken into account in ascertaining the assets to be distributed, and the lease granted to the group which will pay the cash value. If it has no cash value, then whoever receives it will have to pay the rent during the term, and in case no agreement is reached as to it, I award it to the assenting group on their paying the rent, and being accepted by the lessor. If not accepted by the lessor, then it is awarded to the other group. Without discussion I am of the opinion the claim that the order is a corporation for profit has no relevancy to the controversy.

The costs of the case, including special charges by the stenographer, are to be paid out of the property before division. An entry may be prepared accordingly, with exceptions and notice of appeal, with a suitable bond in case of appeal and suitable provision to the holder of the property to release him on surrender.